433 So.2d 1371 (1983)
Wayne POORMAN, Appellant,
v.
MUNCY & BARTLE PAINTING and Reliance Insurance Company, Appellees.
No. AO-258.
District Court of Appeal of Florida, First District.
July 13, 1983.
David B. Kesler, St. Petersburg, for appellant.
John H. Thompson, IV, of Earle & Thompson, St. Petersburg, for appellees.
SHIVERS, Judge.
In this workers' compensation case, Poorman appeals the order of the deputy commissioner which denies compensability for an injury to claimant's right knee. We agree with appellant that the findings of the deputy commissioner are not supported by competent, substantial evidence. Therefore, we reverse and remand.
Poorman is 52 years old and has been a painter for 26 years. He has been employed with appellee employer for the great majority of that time, and he is now employed with the employer in a supervisory capacity. On March 26, 1979, while employed as a painter, claimant testified that he and a coworker were moving a coffee table. They lifted the table and claimant started to pivot to the right when pain hit. Claimant testified that the pain went from his shoulder down to his back, his hip, leg and right knee. He testified that his right knee "locked up."
Poorman first saw Dr. Stephens, a chiropractor, on March 27, 1979, the day after the industrial accident. Dr. Stephens' office notes from March 27, 1979, state: "Moving furniture to be able to paint  felt knee & back give way. Continued to work." Dr. Stephens treated claimant initially for the low back problem, and eventually began treating claimant for the right knee problem. Poorman also saw Dr. Wallace, an orthopedic surgeon, during June and July 1979. Dr. Wallace testified that claimant failed to give a history of knee injury and at no time made complaints relative to a knee injury resulting from the industrial accident of March 26, 1979. Dr. Wallace testified that in his opinion claimant's knee injury was not consistent with the injuries sustained in the industrial accident. Claimant also saw Dr. O'Connor, an *1372 orthopedic surgeon, in August 1979. Dr. O'Connor opined that there was a causal connection between the right knee injury and the industrial accident based on his belief that claimant began complaining of the knee symptoms within a few months of the industrial accident.
The claimant was paid permanent partial disability benefits for his injury to the low back, but the employer/carrier contended that the right knee injury was not compensable due to no causal connection with the industrial accident. Poorman made a claim for Dr. O'Connor to do an arthroscopic examination of the right knee and a partial meniscectomy and for attorney's fees and costs. The deputy commissioner denied the claim, finding that the right knee injury was not causally related to the industrial accident.
The only live testimony taken by the deputy commissioner was that of claimant. Since claimant testified that his right knee "locked up" during the industrial accident, it is clear that the deputy commissioner would have found the right knee injury compensable if he had believed claimant. Although the deputy commissioner found the claimant to be a sincere, honest person, he also found claimant to be confused. Therefore, the deputy commissioner based his decision totally on the medical depositions. We note that the vantage point of this court is not inferior to that of the deputy commissioner in interpreting deposition evidence. Kelly v. Florida Atlantic University, 413 So.2d 833 (Fla. 1st DCA 1982). We find that the medical evidence sub judice leads to a conclusion of compensability.
Where an injury is shown, and the evidence presents a sufficiently logical explanation of a causal relationship between the accident and the subsequent injury, the burden shifts to the employer/carrier to show a more logical cause. Looney v. W. & J. Construction Co., 289 So.2d 723 (Fla. 1974); Sanford v. A.P. Clark Motors, 45 So.2d 185 (Fla. 1950); McNew v. Southern Intermodal Logistics, 380 So.2d 1145 (Fla. 1st DCA 1980). The evidence in the instant case demonstrates that claimant's industrial accident was such a logical cause and that the employer/carrier failed to show any more logical cause. The deputy commissioner's legal conclusion of non-compensability relies heavily on two of his factual findings. First, the deputy commissioner states: "Dr. O'Connor said that in order for the knee condition to have been caused by the accident, that the claimant's knee problems should have begun within two months of the date of the accident." In fact, however, Dr. O'Connor's testimony was that "[h]e could have had the symptoms anytime from a few weeks afterwards to a few months afterwards."[1] Second, the deputy *1373 commissioner's order states: "Dr. Stephens' office notes do not reflect an actual entry as to a complaint about the knee until July 10, 1979, approximately three and one-half months after the accident." The deputy commissioner apparently overlooked the handwritten office note of Dr. Stephens executed on March 27, 1979, the day after the accident, which states: "Moving furniture to be able to paint  felt knee & back give way. Continued to work." The deputy commissioner also apparently overlooked the testimony of Dr. Stephens that "[h]e complained of the knee from the beginning and I really associated it more with the nerve in his back, but as we went on, my recollection is that we started treating both the back and the knee."
The only evidence which supports the finding of the deputy commissioner is the deposition testimony of Dr. Wallace, who treated claimant from June 4, 1979, to July 3, 1979. Dr. Wallace stated unequivocally that, based on the arthrogram report and the fact that during four visits the claimant never complained of a knee injury, the knee injury was not consistent with the injuries sustained in the industrial accident. Although the testimony of Dr. Wallace does provide evidence which supports the conclusion of the deputy commissioner, it does not appear from the order that the deputy commissioner placed greater weight on Dr. Wallace's testimony than on that of Drs. Stephens and O'Connor. It is true that a deputy commissioner generally need not explain when he accepts the testimony of one doctor and rejects that of another. Buro v. Dino's Southland Meats, 354 So.2d 874 (Fla. 1978). Exceptions to this rule exist, however, where the reason for the finding in the order is not apparent from the record, or where, as here, it appears that the deputy commissioner has overlooked or ignored evidence in the record. Rouse v. Wyldwood Tropical Nursery, 392 So.2d 370 (Fla. 1st DCA 1981). In the instant case it would appear to be more in accord with logic and reason to give greater weight to the history provided by Dr. Stephens, who saw claimant on the day following the accident, than to the testimony of Dr. Wallace, who first saw claimant several months after the accident.
Accordingly, the order of the deputy commissioner dated August 30, 1982, is reversed, and this cause is remanded for further proceedings.
REVERSED and REMANDED.
BOOTH, J., concurs.
MILLS, J., dissents with opinion.
MILLS, Judge, dissenting:
I dissent. I would affirm because there is competent substantial evidence in the record supporting the Deputy's order.
NOTES
[1] The following is an excerpt from Dr. O'Connor's deposition:

Q Okay. What history did you take from Mr. Poorman on August 28 of 1979 when you saw him?
A He said that he had sustained an injury while working for Muncy and Bartle on March 26, 1979 in which he injured his back and his right knee.
He said he was lifting a coffee table and he felt something pulling on the right side of his body and he fell to the ground and while getting up he felt that he might have twisted his right knee.
Q Okay. And I assume that it's the twisting of the right knee that gives you the impression that he tore the meniscus in that accident?
A Yes.
Q And the basis for your opinion that the knee is related to the accident?
A Yes.
Q If Mr. Poorman had a pulled meniscus in that accident, how soon after the accident would you have expected him to be symptomatic and what type of symptoms would he have complained of?
A He could have had the symptoms any time from a few weeks afterwards to a few months afterwards. The type of symptoms he would have had  likely to have had would be pain in the knee and/or swelling and/or instability.
Q Did you note any swelling when you first saw him on August 28?
A No.
Q When you say pain in the knee, what type of pain would he have complained of to distinguish sciatic pain from actual pain in the knee?
A Sciatic pain would be more likely to involve the back of the knee, pain from an internal derangement in the knee would be more likely to involve the inside of the knee, medial side of the knee and generally speaking there would be no localized tenderness associated with sciatic-type pain in the knee, whereas there would be with pain due to internal derangement.
Q And, as I understand it, the accident he reported to you occurred on March 26, 1979 and you didn't see him until five months later on August 28 of 1979?
A That's correct.
Q Okay. You mentioned that you would have expected him to have had pain in the knee within a period of a few weeks to a few months after the accident on March 26, 1979, Do we mean two weeks to two months?
A Something like that or right away, of course.
Q Okay. And your opinion that the tear of the medial meniscus was causally related to that accident would be dependent upon whether he had pain on the inside of the knee, localized tenderness in the knee as opposed to the back of the knee within a period of immediately to two months after the accident that he has reported to you?
A I wouldn't go so far as to say that was the only  would be the only criterion, but that would be important in making your assessment.
Q Okay. If we assume that he had none of those symptoms prior to the time that he saw you on August of 1979, would that change your opinion as to the causal relationship?
A Sure.