ERVIN, Judge,
dissenting.
I would reverse and remand this cause to the judge of compensation claims (JCC) for additional findings.
In his order, the JCC places great emphasis upon the fact that the claimant was informed by a representative of the Division of Workers’ Compensation (DWC) that, in order for his claim to be compensa-ble, he was required to have been subjected to overexertion or physical stress uncommon to the type of work to which he was accustomed. The JCC emphasizes that all of the medical testimony regarding claimant’s heart attack and ruptured disc was based upon histories given by claimant after the date that he was informed of the need for evidence of overexertion. I have no difficulty in sustaining the JCC’s conclusion that claimant’s report of a heavy package, delivered to him by UPS, postdated the receipt of this information from the DWC. My difficulty, however, arises from the JCC’s conclusion that, because the claimant’s report of a heavy package postdates the receipt of this information from the DWC, his injuries are not work-related, despite the existence of evidence in the record to the contrary, which the JCC fails to address in his order.
This court has held in Calleyro v. Mt. Sinai Hosp., 504 So.2d 1336 (Fla. 1st DCA), review denied, 513 So.2d 1062 (Fla.1987), that a JCC must explicate sufficiently the reasons for rejecting the testimony of witnesses and the claimant if the reasons are not apparent from the record. Id. at 1337. See also Poorman v. Muncy & Bartle Painting, 433 So.2d 1371, 1373 (Fla. 1st DCA 1983) (a JCC must explain why he accepts certain medical testimony and rejects contrary testimony if the reasons for the JCC’s findings are not apparent from the record, or if it appears that the JCC has overlooked or ignored evidence in the record). In the instant case, although the JCC explains that he disregarded the claimant’s post-notice report because of its timing, the JCC fails to state why he totally disregarded the testimony of certain other witnesses helpful to the claimant. Specifically, the JCC’s order is silent regarding the testimony of Hunt, a security guard at the Ocala Jockey Club, who was on duty on September 6, 1983, the day claimant said *119 the package was delivered. Hunt testified that on September 6, 1983, the claimant complained:
[S]ome packages had come in that day and that one of them was heavier than usual and that he [the claimant] thought he had hurt his back....
******
He [the claimant] said he did hurt his back. He said he had hurt his back because he hadn’t expected it [the package] to be as heavy as it was, and it caught him off guard. He said he definitely hurt his back.
Thus, although the JCC finds in his final order that the claimant’s testimony regarding the delivery of a heavy package on September 6, 1983 is not credible, the JCC fails to explain why the supporting testimony of Hunt lacks credibility, if indeed it does.
In addition, the JCC fails to explain why he rejected the testimony of security guard Hunt and Murphy, the operations manager of the Ocala Jockey Club, on the issue of UPS deliveries. Murphy testified that in all of the years he had been employed there, he had “never seen them [UPS] do anything but drop the packages or whatever deliveries they had at the guardhouse.” Then Murphy was asked, “Can you ever recall any specific time when UPS did make an actual door-to-door delivery at a home inside the Jockey Club?” He replied, “No, I can’t.” Hunt was asked, “While you were there, did the UPS driver ever make the rounds and deliver the individual packages to the customers or the people who live in the condominiums or whatever units they are?” He responded, “No. I can’t remember a single time that they ever did, no.” This testimony supports the claimant’s version of the events, and directly contradicts the testimony of the UPS delivery man, Roberts (upon whose testimony the JCC expressly relies in denying claimant’s claim), that he delivered six packages directly to residents on September 6, 1983; yet, the JCC offers no explanation for his failure to take the testimony of the operations manager and security guard into account.
Furthermore, although the JCC expressly places great reliance upon the testimony of Roberts that he had not delivered a heavy package on September 6, 1983, but that he might have delivered a heavy package in late August, the JCC makes no mention of Roberts’ testimony in which he admitted:
I very definitely did deliver him a heavy package.... And it probably was over 50-pound package. But it wasn’t on this day....
******
It could have been on the day before or the day after; it could very well have been, you know. I think it was some kind of soap product for that trainer up there, if I remember right. It was a very dead-weight heavy package.
******
Sure[,] it could have been the day before. The JCC offers no explanation for his selective acceptance of Roberts’ testimony. It is error for the JCC to accept certain portions of a witness’s testimony which support the denial of a claimant’s claim, while at the same time rejecting other parts of the same witness’s testimony which support the claimant’s claim, without giving reasons for such selectivity.
Far more troubling, however, is the JCC’s statement that “Mr. Roberts has no interest in the outcome of this action which lends credibility to his testimony.” To the contrary, the record discloses that the claimant in this case sued both Mr. Roberts and UPS, and that that litigation, although dismissed without prejudice, had not been concluded at the time of the hearing below. Thus, it appears that the JCC overlooked certain evidence in the record that tends to undermine the credibility of witness Roberts, upon whom the JCC places great reliance. The JCC’s oversight of Roberts’ bias is especially glaring in view of the testimony of Murphy and Hunt that UPS had never made a delivery inside the Ocala Jockey Club compound, but rather left all packages for residents with the guard on duty at the guardhouse. If it is error to accept selective portions of a credible wit *120 ness’s testimony, such error is compounded when the JCC, as here, selectively accepts the testimony of a biased witness, while offering no explanation for rejecting the contrary testimony of two apparently unbiased witnesses on a critical point.
Furthermore, the delivery man Roberts testified that he had made the delivery of six packages to residents of the Ocala Jockey Club on September 6, 1983, during a total time period of ten minutes. When Hunt, however, was asked whether “the time indicated [on the roster] ... is reasonably sufficient to allow delivery for each and every person and meet the customer personally by the UPS driver?” he responded, “Pm saying it was impossible.” When further asked, “Can you tell from the way those [addresses] are listed on exhibit 1 [the UPS delivery sheet] ... whether or not those are in order that you would come to those box numbers if you went around the loop [of the Ocala Jockey Club]?” Hunt answered, “They are not, no, sir. Those are definitely helter-skelter. Those are definitely mixed.” In other words, Hunt emphasized how difficult it would be to make the deliveries Roberts testified to making, within the time he testified to having made them. Nevertheless, despite its impeaching effect on the testimony of Roberts, the JCC again offers no reason for rejecting Hunt’s testimony.
I have additionally reviewed the medical testimony, in order to determine whether such testimony could support causation regardless of whether the package at issue was delivered in September or in August. The testimony of Joseph C. Cauthen, M.D., supports a conclusion that the claimant’s back injury was caused by the transfer of the package to claimant, regardless of when the package was delivered. For example, Dr. Cauthen stated: “If the history is accurate, that Mr. Hicks had no pain prior to lifting a 60-pound weight while under employment at the Ocala Jockey Club in 1983, and if the onset of pain began at that time, I would relate his complaints at that time and subsequent complaints to the lifting incident.” And specifically: “Assuming the elements of the hypothetical question to fairly represent the facts, I would again submit that if he had no complaints of back pain prior to the lifting incident and had complaints of back pain following the incident, that there would be a causal relationship.” In other words, Dr. Cauthen testified that the objective findings support a permanent injury, and that the diagnosis of a central herniated disc at L5-S1 is consistent with a history of lifting a heavy weight.
Additionally, I note that Dr. Regalado testified that claimant’s back pain could have been masked by heavy doses of pain medication administered in the hospital to treat claimant’s life-threatening heart condition. Cf. Ralosky v. Dynamic Builders, Inc., 500 So.2d 193 (Fla. 1st DCA 1986) (evidence that medication administered to claimant while in hospital to relieve back pain, which masked pain in claimant’s feet of which claimant later complained, supported a determination of a causal connection between claimant’s industrial accident and an injury to claimant’s feet).
Underscoring the numerous inaccurate factual findings throughout the JCC’s order is the additional statement in paragraph 8, finding: “All of the opinions of causal relationship rendered by the physicians and chiropractor testifying were based on the claimant’s version of the facts and add no credibility to the Claimant’s story.” With respect to Dr. Cauthen’s testimony, at least, this statement is not accurate, because the thrust of Dr. Cauthen’s testimony is that the objective findings and the subjective findings present no internal inconsistency, regardless of the specific date of the lifting incident.
In summary, although I agree that there is evidence in the record to support the JCC’s finding that the claimant first reported the connection between lifting the heavy package and his injuries only after October 31, 1983 — the date of the DWC’s claim-denial letter — nevertheless, the JCC appears to assign a primacy to this finding (the timing of the package-injury connection), which has the effect of ignoring the evidence of the record as a whole. Moreover, other findings of the JCC, as previously indicated, are contradicted by the record. *121 Additionally, the JCC inconsistently rejects that portion of the testimony of Roberts that supports the claimant’s claim, while accepting and relying upon other testimony of Roberts that undermines the claimant’s claim, without giving reasons for such selectivity. Finally, the JCC rejects the testimony of Murphy and Hunt, which was contradictory to Roberts’, without giving reasons.
Thus, because the JCC’s order fails to adhere to the standards set out in Calleyro, I would, as stated, reverse the order denying the compensability of the claim and remand the case to the JCC for further explication of the matters discussed in this dissent.